## TEXAS EMPLOYERS' INS. ASS'N v. PE-TERSON et ux. (No. 2139.)

(Court of Civil Appeals of Texas. Amarillo. May 2, 1923. Rehearing Denied May 23, 1923.)

1. **Master and servant** ⬩405(5)—**Evidence held to show parents were dependents under Compensation Law.**

Evidence *held* sufficient to show that claimants were dependent parents under the Workmen's Compensation Law and entitled to compensation for death of son.

2. **Master and servant** ⬩388—**"Dependent" parents within Compensation Law defined.**

Parents of a deceased employee are protected, under the Workmen's Compensation Law (Vernon's Sayles' Ann. Civ. St. 1914, arts. 5246h–5246zzzz), when they are "dependent" in whole or in part upon the services or contributions of the child for support, which is not restricted to the bare necessities of life, and the test of dependency is not whether they could support life without the contributions, but whether they depended on such contributions as a part of their income or means of living.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Dependent.]

3. **Master and servant** ⬩388—**Dependency within Compensation Law question of fact.**

Whether a parent is dependent upon a child within the Workmen's Compensation Law is a question of fact.

4. **Master and servant** ⬩388—**Charge on dependency within Compensation Law held incorrect.**

A charge that the mere fact that parents received money from a son and expended it is not alone sufficient to establish dependency within the Workmen's Compensation Law (Vernon's Sayles' Ann. Civ. St. 1914, arts. 5246h–5246zzzz) *held* properly refused.

5. **Trial** ⬩351(5)—**Denial of issue involving only evidentiary fact held not error.**

In a proceeding under the Workmen's Compensation Law (Vernon's Sayles' Ann. Civ. St. 1914, arts. 5246h–5246zzzz) by parents claiming to be dependents of a deceased son, refusal to give a special issue requested by defendant as to whether claimant was able to support himself and wife out of his own earnings *held* not error, where the court had already submitted an issue of fact, and the issue requested requiring only a finding upon an evidentiary instead of an ultimate fact.

6. **Master and servant** ⬩405(5)—**Dependency within Compensation Law proved without arithmetical demonstration.**

Dependency within the Workmen's Compensation Law (Vernon's Sayles' Ann. Civ. St. 1914, arts. 5246h–5246zzzz) may be proven as a fact without an arithmetical demonstration.

7. **Master and servant** ⬩417(4) — **District court hearing compensation case may award lump settlement, though not considered by Board.**

Where proceedings under the Workmen's Compensation Law (Vernon's Sayles' Ann. Civ. St. 1914, arts. 5246h–5246zzzz) have been transferred to the district court, that court has jurisdiction of the whole case and may pass on the question of a lump settlement, though the question was not considered by the Industrial Accident Board.

Appeal from District Court, Wichita County; P. A. Martin, Judge.

Proceedings under the Workmen's Compensation Law by Charles P. Peterson and wife, claimants, opposed by the Texas Employers' Insurance Association. Judgment for claimants, and defendant appeals. Affirmed.

Lawther, Pope & Leachman, of Dallas, and Davenport, Wilson & Thornton, of Wichita Falls, for appellant.

Weeks, Morrow & Francis, of Wichita Falls, for appellees.

KLETT, J. The Texas Employers' Insurance Association has appealed from a judgment rendered by the district court of Wichita county in favor of appellees, Charles P. Peterson and wife, Eddie Peterson, for a lump sum compensation allowed them as dependents of their son, Rufus A. Peterson, who was killed while in the employment of the Gulf Production Company. The appellant questions the sufficiency of the evidence to support the affirmative answer of the jury to the following special issues submitted to the jury:

"(1) Were the claimants, Charles P. Peterson and Mrs. E. Peterson, as parents of Rufus Peterson, deceased, taking into consideration their condition and circumstances in life, dependent upon the labor of the deceased, Rufus Peterson, for support at the time of the injury which resulted in Rufus Peterson's death?

"(2) Would a failure of the insurance association to make a lump sum settlement with claimants of the compensation, if any due them on account of the death of their son, Rufus Peterson, work a manifest hardship and injustice to them?"

Rufus Peterson was an unmarried son, 25 years of age, and living with his father and mother up to the time of his death on April 12, 1920. He and his father were working for the Gulf Production Company, each earning about $150 per month as laborers. The father started working for this company about 1918. Prior to that time the family lived at Rochester, Tex., where the mother remained until the fall of 1919, when she joined her husband and son in making their home on the company's lease about 10 miles north of Iowa Park. When the mother came,

the father bought some lumber on credit and built a small four-room shack on the lease. The son lived in this house with his parents until his death. The father testified that the son made substantial contributions to the support of the family; that the son purchased two milk cows, only one of which supplied milk at the time of the boy's death; that although wages were good, living expenses at that time were high, especially in the oil field; that the grocery bill was probably $100 per month; that it cost $15 per month to feed the milk cow; that in September, 1919, the son gave the father a check for $50 to pay for money borrowed at Rochester to go out to the oil fields; that the father, who was "badly broke" at Rochester, was out of work and could not get a job; that the son paid dues and fees for his mother and father in the Odd Fellows, Rebeccah, and Woodmen Lodges; that the checks exhibited in evidence were given by the son for the support of the family; that the son frequently gave the father and mother cash and checks for living expenses; that the father used the son's money whenever needed; that the son bought clothing for his mother, bought anything she wanted to get, although she did the buying; that she traded with Sears & Roebuck and also Montgomery Ward; that she bought clothes, hats, shoes, dresses, cloak goods, underwear, and some furniture, "all the time, every year"; that the son furnished the money. With reference to the checks the father testified:

"Those different checks you now hand me bear the signature of Mr. Rufus A. Peterson; those were his signatures on those checks. Yes, sir; those are his signatures on his checks. Yes, sir; I know what those checks were issued for by him; they were issued by him for supplies, for necessities to go on with; that is part of the money he paid out for our support; that is money paid for material and supplies purchased by him. Besides being different supplies which those checks represent, he furnished cash about every month."

Mr. Peterson also stated that the cash contributed by his son ran from $25 to $50 per month. Concerning the family income and expense Mr. Peterson added:

"Yes, sir; it took approximately our joint earnings to keep up the family. As I stated, I had $600 or $700 in the bank when he died. It taken all of that and more too to bury him. That is gone; yes, sir. I have nothing left; no, sir; have no home in Electra. * * * Aside from the money and expenses that my son incurred while he lived with us, it is not a fact that I was able to provide for myself and wife according to my class and position in life from my working money. Well, no sir; not while I was with the Gulf Production Company. No, sir; I did not have sufficient money from my work to take care of myself and wife. Been several times he had to help me to take care of my wife and his sister. Well, he would give me $15, $20, and $25 a month, sometimes $50. No, not to just take care of his sister. $50 was the most he ever gave me a month as I stated to you this morning; gave me that on several different occasions. As I stated this morning, we never kept any record of anything. It was not necessary. He was a home boy."

There was also testimony by the father that the boy was industrious and frugal, but we find nothing in the record showing that the boy had accumulated any money or had any bank balance. It was shown that at the time of the son's death the father had a bank balance of $907.99; that the fund had gradually grown since the father started the account until the son's death, but that since the son's death the account had become smaller and smaller; that on the date of the trial the balance was $162.31. Mr. Peterson stated at the time of trial (October, 1921) that he could not work then on account of his left leg, which was injured about two years previous while working on the lease; that he was able to do the work as pumper because his fellow workmen were kind and good to him and assisted him; that he could still do the same work if he had the same helper, although he worked when he was not able to do so; that about a year after his son's death the company released him without explanation, and that since then he has not been able to get employment; that he was not able to do lifting or much walking; that his wife had been in bad health for several years; that he had no home and was then paying $20 per month rent in Electra; that he did not see how he could keep himself and wife on a weekly compensation of $15; that he had no funds on hand with which to buy a chicken farm, but if the money were paid in lump sum he could buy a chicken farm, reduce his expenses, and earn a living for himself and wife.

Mrs. Peterson, the mother, testified that the son contributed from $25 to $50 to the support of "my husband and I." She also undertook to explain some of the checks introduced in evidence. She declared that they were signed by her son; that one was for an incubator purchased for her by the son, at Christmas time in 1919; that one check given in December, 1919, for $14.65, was for "clothing, pair of shoes and domestic"; that a check for $17, given in November, 1919, was "for a few remnants"; that a check for $12 was to buy clothing "for me to clothe my body." She testified generally as follows:

"Yes, since my husband went to work for the Gulf Production Company he has been sick and has been disabled to work, unable to purchase the necessities for my husband and I. From time to time he would be unable to work, and if it hadn't been for his partner he would absolutely have had to lose his job. Well, the other fellows worked in his place; his partner did. Part of the time he drew his pay. Yes, I know that he drew his regular check for over a year

before the boy died and the year after, excepting the time he was off when the boy died; he may have. I say he was not able to work; you asked me about him. * * * My son was a great mother boy about helping around the house. I have been almost a total wreck in health for some two years prior to his death. Very little work that I was able to do. I am hardly able any of my time to do my house work. Yes, sir; he helped me about that. I am 51 years old. He was the only child who stayed at home to help me. Yes, sir; he was the only source of help I had for my old age, except my husband, and as he stated this morning, he was unable to do very much. Yes, sir; he is a cripple."

B. V. Bogey, a grocer, testified that the son was a regular customer of his, though he did not trade exclusively with him; that "sometimes every day he was in the store"; that he got his checks cashed at the store and paid out his own money for the groceries; and that he got his pay check cashed every two weeks.

[1, 2] We think the evidence sufficient to show that claimants were "dependent" parents under the Workmen's Compensation Law of Texas (Vernon's Sayles' Ann. Civ. St. 1914, arts. 5246h–5246zzzz). The parents of a deceased employee are protected under the statute when they are dependent in whole or in part upon the services of contributions of the child for support. Dependents are not restricted to the bare necessities of life; they are entitled to the compensation when the support received "includes also the ordinary comforts and conveniences reasonably appropriate to a party's station in life— such as were actually being enjoyed by them at the time of and prior to their son's death." Lumbermen's Reciprocal Association v. Warner (Tex. Com. App.) 245 S. W. 664, and authorities therein cited. We accept as correct the appellant's frank statement of the law as follows:

"The test of dependency is not whether a beneficiary could support life without the contributions, but whether he depended upon such contributions as a part of his income or means of living. Bradbury, Workmen's Compensation (3d Ed.) p. 743; Southern Surety Co. v. Hibbs (Tex. Civ. App.) 221 S. W. 303."

[3, 4] The appellant complains of the refusal of the trial court to give special charge No. 2, reading as follows:

"Gentlemen of the jury, in connection with your consideration of special issue No. 1, you are instructed that the mere fact that a father and a mother received money from a son and expended it is not alone sufficient to establish dependency."

In connection with the first special issue, the court gave the appellant's special charge No. 1, reading as follows:

"Gentlemen of the jury, you are instructed that for you to answer special issue No. 1, 'Yes,' you must find from a preponderance of the evidence that the deceased's parents relied upon contributions from the deceased for at least a substantial part of the ordinary necessities of life, suitable for persons in their class and position in life."

We think the appellant received all the charges he was entitled to. Whether a parent is dependent upon a child is a question of fact. Southern Surety Co. v. Hibbs (Tex. Civ. App.) 221 S. W. 303; 28 R. C. L. 779, § 72. A similar special charge was considered in Lumbermen's Reciprocal Association v. Warner, supra. It was held by the Supreme Court that it was not error to refuse such a charge, as it excludes from the consideration of the jury the time and labor which the son may have given to his parents.

[5, 6] Error is assigned to the refusal to give appellant's special issue No. 1, reading as follows:

"Was the claimant Charles P. Peterson able to support himself and wife out of his own earnings in a manner befitting persons in their class and position at the time of the accident?"

We think the court's first special issue submitted one of fact, and that the special issue requested by defendant merely called for a finding upon an evidentiary fact instead of the ultimate fact. Millers Indemnity Underwriters v. Green, 237 S. W. 979 (writ refused). For the same reason we overrule appellant's assignment that the trial court erred in refusing to give appellant's fourth special issue calling for a finding as to the amount of money it cost the parents to supply the son with board. The appellant also requested the trial court to submit to the jury the association's fifth special issue inquiring as to the amount of money necessary to support the parents in a manner befitting persons in their class and position in life. We are also of the opinion that this issue called for the finding of an evidentiary fact. Dependency may be proven as a fact without an arithmetical demonstration. Burns v. Connecticut Light & Power Co. (1922) 97 Conn. 688, 118 Atl. 45.

[7] It is claimed by appellant that the district court had no jurisdiction to award a lump sum settlement because the record is "silent as to whether the Industrial Accident Board had passed upon the question." It appears from the statement of facts that on the trial below there was a stipulation between the attorneys that—

"The claimant agrees that the Texas Employers' Insurance Association has properly perfected its appeal to this court, * * * and both claimant and Texas Employers' Insurance Association agree that this court has jurisdiction."

It seems this agreement was made to save the trouble and expense of making a formal proof of the proceedings before the Industrial Accident Board. We hold that the court

had jurisdiction to pass on the question of lump sum settlement, as there is nothing in the record or agreement to negative jurisdiction; but, however this may be, we think the district court had jurisdiction of the whole case after it was transferred to such court. In Lumbermen's Reciprocal Association v. Behnken, 246 S. W. 72, the Supreme Court of Texas held:

"After the claim of defendants in error was denied by the Industrial Accident Board, the district court had jurisdiction to determine all issues between the parties, regardless of whether defendants in error's right to lump sum compensation had been asserted before the Board. In so holding, the Court of Civil Appeals followed the plain letter and intent of the statute."

We are not in position to say that the trial court exceeded its authority or abused its discretion in awarding a lump sum settlement. Miller's Indemnity Underwriters v. Green, 237 S. W. 979 (4), writ refused; see authorities therein cited.

We overrule the appellee's request that a 10 per cent. penalty be added for delay.

The judgment of the trial court is affirmed.